IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALPHONSO RAY WILSON,<br><br>                          Petitioner,<br><br>            vs.<br><br>ERIC ARNOLD, Warden, California State Prison, Solano,<br><br>                          Respondent. | No. 2:14-cv-02288-JKS<br><br>MEMORANDUM DECISION |

Alphonso Ray Wilson, a state prisoner proceeding *pro se*,[1] filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Wilson is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Solano. Respondent has answered, and Wilson has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On February 4, 2008, Wilson was charged with murdering James Werder and Manuel Caldera. The information alleged that each murder was a serious felony and that, as to each murder, Wilson personally used a firearm that caused death. It further alleged that the charges were a special circumstance of more than one murder and that each of the charges was a special circumstance of murder committed during the commission of a robbery. On direct appeal of his conviction, the Court of Appeal recounted the following facts and evidence underlying the charges against Wilson and described an interview Wilson gave while he was incarcerated:

---

[1]      Wilson's brief in support of his Petition was drafted by Gene D. Vorobyov, California Bar No. 200193, who represented Wilson in his appeal in the California state courts. Wilson agreed that Mr. Vorobyov would not provide further assistance, and Mr. Vorobyov has declined to make an appearance before this Court. Respondent does not object to Mr. Vorobyov's involvement in this case.

**A. *The Robbery and Murders***

On January 17, 2007, the police found the bodies of two men, James Werder and Manuel Caldera.  Several months later, and after being given *Miranda* warnings, [Wilson] was interviewed by San Joaquin Deputy Sheriff Kevin Ming and Vallejo Detective Steven Cheatham.  [Wilson] first denied any involvement in the killings, but ultimately confessed that he and another man, Charles Camper, had robbed Caldera and Werder.  He told the police that, during the robbery, Camper killed Caldera and Werder.

Wilson told the police officers that Werder and Caldera operated an ice cream truck business.  They also grew and sold marijuana.  Wilson and Camper,[3] lived with Werder and Caldera.  Wilson was 18, and had been in special education for "a little bit of ADD" since the third grade.  Wilson had been friends with Camper for several years, but dropped the friendship because Camper was involved with gangs.  However, when he needed a place to stay, Wilson stayed with Camper for about three months, and they became friends again.

> FN3.   Charles Camper was found shot to death in the Sacramento–San Joaquin Delta prior to Wilson's trial.

After Wilson met Werder and Caldera, the two men told him that they "got a little job for you [Wilson] I want you to do."  Werder and Caldera asked him to work in their ice cream truck business and Wilson agreed.  Wilson didn't know until he got to their house that they "had a weed lab there."  He described his reaction to this discovery as follows: "And so I'm in the house like man, I have to stay here with you guys?  And they was like, 'Yeah.'  Then I was like, 'With all this stuff downstairs'?  I'm like that's gonna be hard but I was making a little side . . . a little side money . . . . [¶] [b]y working the ice cream truck, I was into stuff like that."  He didn't smoke marijuana and he didn't want to be around it.  Camper didn't immediately move into the house because he was 17, and Werder and Caldera needed someone who was 18.

Wilson moved in with the victims in October and Camper joined him in November, after he turned 18; Wilson was with Manuel Caldera "all the time."  Camper, on the other hand, had a warrant out for his arrest, so he stayed in the house and "watch[ed] the weed lab . . . ."  Wilson had his own bedroom and Camper slept on the couch next to Caldera.  James Werder did not live at the house.  Wilson liked going to parties, and went occasionally.  If he had to go somewhere, he would call Manuel Caldera ("T"), who would come and pick him up and take him where he needed to go.

Wilson never had any problems with Caldera or Werder.  He did describe to the detectives how, on one occasion Werder "body slammed" him when he wasn't listening to him.  Although Wilson respected Werder for doing this, he didn't want to be around him.  Wilson was never threatened at the house, never stole anything, and was never accused of anything.  The two men "had so much trust in me."

Wilson got paid for driving the ice cream truck, but Camper did not.  "He [Camper] really wasn't catching on how to grow the weed when they got mad at him.  Talking about they wanted to kick him out.  He [Camper] didn't want to go."  The money Wilson earned selling ice cream was often left on the table in the house for him to spend

for his expenses.  It was his practice to call Caldera first and asked him for permission to do so.

Camper had "go[t] in and out of arguments" with Caldera and Werder.  Wilson told the detectives that neither Caldera nor Werder had threatened to kill Camper.  Nor had they threatened to kill Wilson.  Wilson also told the police detectives that "If they [Werder and Caldera] would have threatened [Camper] then I would have gone, I'm cool . . . . [¶] . . . I would have said I can't work this ice cream business[ and] . . . [¶] . . . I would've left."  The victims did threaten Camper when he first "came in."  They thought Camper was sneaky and told him that "if he ever pull something we're gonna shoot you."

Wilson had seen Caldera shoot people on two occasions.  Camper told [Wilson] that he wished he'd been there.  According to Wilson, Camper told him "my finger trigger happy.  I'm ready to kill anybody . . . . [¶] . . . he like so I'm gonna die anyway . . . . [¶] . . . He don't care if he got it.  He never trying to change his lifestyle."

Asked again about his relationship with the victims, Wilson again said he was not afraid of them and denied that they had threatened to kill him.  He did not think they would kill Camper if he had stolen money from them because he "would be upset," and they would not be able to hide the crime.

It was Wilson's plan to rob Caldera and Werder, and he told Camper "'we might have to take 'em out.'"  Camper "was like, 'All right.'  So then I was thinking like I don't know though, should you do it or not?  Cause you know?  I don't know.  I—I was kind of telling him, it ain't right.  And I was thinking man, that's it for you if you pull the trigger.  And I think he was gonna do it.  I thought he was just bullshitting me, man."

Wilson told the police officer that he felt like "getting out of this gang 'cuz what if the police come and kick the door down?  We got a—they got all this stuff and it don't feel right.  I was like, 'I'm ready to take the money.'  But I was kind of thinking like, I'm gonna wait until they gone and I take they money.  And then I'll just never come back to the Vallejo um, the older guy won't kill me."  He was afraid of the victims.

Wilson and Camper's plan was that Camper would hold Caldera and Werder at gunpoint, and Wilson would take the money.  Camper took a gun out of Caldera's truck before they entered the house.  He told Wilson: "'Are you sure you want to take the money?' . . .  Then he [Camper] was like, 'I'm gonna have to kill 'em.'  Then I'm thinking like—thinking like no let's just take the money, he's like 'I'm gonna have to do it.'  And that's when he hit me with that my finger trigger is itchy."

At some point before this, Caldera and Werder took Camper with them to deliver some marijuana to a customer.  They told Camper, "we know you got a warrant, but come on . . . you can go out this time."  Camper was happy to go.  When they came back, Wilson began "thinking like man, I feel like a hostage up in here.  I'm like man, I can take the money and just be cool.  I don't even have to kill nobody . . . ."

On January 15, 2007, Wilson and Camper entered the house.  Wilson went to the table where the money was located.  "I'm like—am gonna take the money.  And then I was like damn, I kept thinking in my head.  I don't think we should kill 'em."  Wilson told the police that "basically I didn't want to plan out a murder.  I wanted to just take the money and—and get out."  He wanted Camper to point the gun at the victims, frighten

them, so he could "grab the money and we leave."  However, after they entered the house, Camper shot and killed Werder and Caldera.  Wilson watched Camper shoot both men "[a]nd I was like fuck.  I was like you weren't supposed to kill him."

Both men fled to Washington State.  When he eventually returned to California, Wilson was arrested.

At trial, A.P. testified that in January 2007, when she was 15 years old, [Wilson] was her boyfriend.  Sometime in mid-January, [Wilson] came to A.P.'s school to pick her up.  He was driving a silver BMW.  They drove around for a while, then switched to a Chevy Tahoe and then back to the silver BMW.[4]  She was aware that [Wilson] was living in a house with two men and he was helping them harvest marijuana.  She believed that [Wilson] and Camper "were in some kind of gang . . . ."  [Wilson] told her that the situation in the house had become extremely dangerous for him and for Camper.  He told her that the victims "had threatened both Charles [Camper] and [Wilson] to kill them if they tried to leave . . . ."

FN4.   Caldera owned both a Chevy Tahoe and a silver BMW.

[Wilson] told her that he and Camper had been involved in the murder.  He told her that he had taken a lot of money from the victims.  She wasn't sure if the murders were gang-related or simply financially-related.  She remembered telling a police detective after the murders of Caldera and Werder that [Wilson] told her that Camper "had to kill" the victims because they were in a gang.  [Wilson] told her that Camper had killed the victims because he (Camper) "was in a situation where he felt it was kill or be killed . . .."

**B. *Wilson's Interview with Vallejo Times Reporter, J.M. Brown***

While he was incarcerated, Wilson agreed to participate in an interview with Vallejo Times Herald reporter J.M. Brown.  Brown wrote an article for the Times Herald regarding this interview.  The article, *I Am Not a Killer*, was published in the newspaper on March 11, 2007.

In the article, which was not admitted into evidence but came in through Brown's testimony regarding its accuracy, Wilson admitted that he had bragged to his friends about being the killer, but when Brown asked him about it, he said that he had not killed Caldera or Werder.  He remembered telling friends that he had killed Caldera and Werder "for all this money[.]"  He told Brown that the original plan with Camper was simply to steal the cash and the truck, not to kill the men.  The men were his friends, in fact.  Camper, however, was afraid that Caldera and Werder would seek revenge for the robbery, which is why he shot them.  Wilson did not feel the killings of Caldera and Werder were his fault.

*People v. Wilson*, No. A129064, 2013 WL 222321, *1-4 (Cal. Ct. App. Jan. 22, 2013).

The prosecution subpoenaed Brown to testify at a preliminary examination about the article he wrote.  Both the Times Herald and Brown moved to quash the subpoena, arguing that Brown could refuse to testify about any unpublished information related to his interview of Wilson and still be entitled to immunity from contempt.  Wilson also argued that the subpoena should be quashed, but that if it was not quashed, he requested access to "all notes, tapes or any other records" made by Brown.  The Court of Appeal summarized the following facts regarding the motions to quash:

**1. *Judge Getty's Order Denying Vallejo Times Herald's Motion to Quash***
. . . .

All parties ultimately agreed that Brown would testify, without any objection under the shield law, as to the accuracy of "the information that falls within the quotation marks" in the article.

The Times Herald also argued that the shield law gave Brown immunity from prosecution as to information in the article that paraphrased Wilson's statements rather than directly quoted them.  The Times Herald further contended that, as the trial court put it, "unpublished information that doesn't appear whatsoever in the four corners of the article, but [is] known to the reporter through his investigatory efforts" would fall under the shield law as unpublished information.[5]  At this point, the attorney for the Times Herald informed the court that she was uncertain as to whether there were any notes related to the interview.

> FN5.   Defense counsel did not file a subpoena seeking this unpublished information, but the parties agreed that the court would also rule on whether this information would come within the shield law as it applied to a defense request.

The hearing was continued to allow further argument.  On September 21, 2007, Judge Getty held that any of [Wilson's] statements that appeared in quotes in the article, as well as those paraphrased in the article were published materials and, therefore, Brown had no immunity from prosecution should he refuse to testify about them.

As to the defense's ability to cross-examine Brown on unpublished matters related to the interview, the court found that "there has been sufficient offer of proof by [the defense attorney] that the release of the unpublished materials to the defense would reasonably possibly assist in the defense especially given the inculpatory statements that have been reported."  Therefore, the court denied the motion to quash.

The court elaborated briefly on its decision noting that "sitting here today, all I would order disclosed, which is why I'm not certain we need an in camera review, is his

notes, any audiotape between him and Mr. Wilson and there really is nothing else for me to disclose.  It will only come up when he is questioned on the stand."[6]  The court went on to state that it was uncertain whether "Mr. Brown is requesting an in camera review for the purpose of the disclosure of the unpublished information."  However, no such review was requested and the court's denial of the motion to quash was memorialized in Judge Getty's order of September 21, 2007.

> FN6.   The court emphasized that its order was not directed to "any other confidential sources," such as "some source reported about some conversation with a police department person" and, accordingly, did not approve the release of that kind of material.

**2. *Judge Harrison's Order Granting Vallejo Times Herald's Motion to Quash***

At this point, the case's path took a significant turn.  On October 3, 2007, the public defender was relieved as defense counsel because of a conflict.  A new attorney, John Coffer, was appointed to represent Wilson.  At that time, the court specified that Brown "is still under subpoena."

Shortly afterwards, Judge Getty was reassigned and, therefore, did not preside over the preliminary examination.

A second judge, Judge Smith, continued the preliminary examination to December 14, 2007.  A third judge, Judge Harrison, was then assigned to the case and the preliminary examination was continued once again, this time to January 2008.  A fourth judge, Judge Kinnicutt, presided over the trial.

On January 18, 2008, prior to the preliminary examination, the Times Herald and Brown filed "evidentiary objections" to anticipated questions.  These "objections" restated the arguments Judge Getty had previously rejected when she denied the motion to quash.  Among the areas characterized as objectionable were "[q]uestions about the content of [Wilson's] statements to Mr. Brown," questions about the "flow of" conversation between Mr. Brown and [Wilson] and/or how long [Wilson] spoke about each matter raised, questions about [Wilson's] comprehension of the charges against him and/or the questions posed by Mr. Brown, "[q]uestions about [Wilson's] general demeanor, mental state and related matters," and any "[r]equest to Mr. Brown to produce unpublished notes."

At the preliminary examination, Brown refused to answer the People's questions regarding anything other than the fact that he had written the statements found in the article.  Asked about paraphrases of certain statements made by [Wilson], Brown refused to testify.  Accordingly, the court (now Judge Harrison) held him in contempt.  Brown then agreed to, and did, answer the People's questions regarding his paraphrases of statements in the article.

On cross-examination, defense counsel began to question Brown on issues related to the newspaper article.  The Times Herald and Brown contended Brown would refuse answer questions about unpublished information related to the interview and was, under the shield law, entitled to immunity from contempt.

At this point, defense counsel became aware that Brown had notes regarding the interview. Defense counsel then requested that the court hold an in camera hearing to determine whether these notes contained any information that would assist in Wilson's defense. Defense counsel was asked to make a showing that the notes could possibly assist in Wilson's defense. Defense counsel argued that because Brown did not remember the content of the notes, the notes were the best evidence of the interview, the newspaper article was hearsay, and he had no way to cross-examine Brown on the accuracy of the article as confirmed by his notes. The court agreed that the fact there were notes of the interview indicated there was a possibility that the notes might shed light on the accuracy of the article. The court concluded that, "in and of itself, [the notes] could, as a possibility, assist the defense."

Judge Harrison then held an in camera review of the notes, from which he excluded defense counsel. Defense counsel objected to this exclusion. After reviewing Brown's notes, the court held that there was nothing in the notes that justified disclosure to the defense and "that the reporter's privilege and shield law still applies."

At the preliminary hearing, defense counsel sought to examine Brown on issues regarding statements made by Wilson during the interview that were not recorded in the article, and questions, including follow-up questions, Brown might have asked Wilson during the interview. Counsel also sought information about Wilson's demeanor during the interview. The court sustained objections to these questions under the shield law.

At the end of the preliminary hearing, the defense moved to have Brown's testimony stricken on the ground that the application of the shield law had denied him the right to cross-examine Brown and thus was a denial of Wilson's due process rights. This motion was denied.

**3. *Judge Kinnicutt's Order Granting Vallejo Times Herald's Motion to Quash***

On February 5, 2009, before the fourth judge to preside over this matter, Judge Kinnicutt, the Times Herald filed the same motion to quash the prosecution subpoena of Brown it had earlier filed. Judge Kinnicutt granted the motion to quash and the objections to anticipated questions regarding unpublished information concerning Brown's interview.

*Wilson*, 2013 WL 222321, at *4-6.

At trial, the court indicated that the previous ruling was still applicable that Brown's notes were not discoverable because the in camera review revealed that there was no material that would be helpful to the defense. The court also stated that Brown would be expected to testify and to answer the questions within the parameters set at the preliminary examination. During the prosecution's questioning of Brown, defense counsel made a series of objections to

the quoted portions of the newspaper article on the basis of hearsay.  When Brown indicated that

he could not recall anything that Wilson told him, defense counsel moved to strike Brown's

entire testimony on hearsay grounds.  The court ruled, "It's admissible under Evidence Code

1237."[2]  Defense counsel then noted a continuing objection on the grounds of hearsay to each

question asked of Brown.  Defense counsel also objected to the introduction of the newspaper

article itself as an exhibit, which the trial court sustained.

    During defense counsel's argument to the jury, the prosecutor made four objections, three

of which were sustained.  The first and second objections occurred after defense counsel had

explained that the prosecutor's theory of the events might be reasonable, but was not the only

reasonable theory.  He argued:

---

[2]     That rule provides:

    (a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:
> (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;
> (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;
> (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and
> (4) Is offered after the writing is authenticated as an accurate record of the statement.

    (b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party.

CAL. EVID. CODE § 1237.  This rule governing past recollection recorded is similar to Federal Rule of Evidence § 803(5).

The DA has presented one theory.  Granted, that might be a reasonable explanation, but it's not the only one.  I think I told you one reasonable explanation in my opening statement, which was that what happened here was Mr. Camper had been threatened – both of them had been threatened.  They were fearful.

The prosecutor objected on the ground that there was no evidence in the record to support

counsel's argument.  The trial court sustained the objection.  Defense counsel continued:

I believe there was evidence from my client's girlfriend that the reason this happened was because they had been threatened to be killed, they were fearful, so Mr. Camper went and shot them, and then they took the money and ran.
Is it reasonable to think that they were threatened?  Well, these are dangerous characters. They dealt in drugs.  They dealt in guns.  They certainly valued their secrecy. They had an advanced surveillance system.  Their friends couldn't tell anybody where they were.  Mr. Caldera slept in the living room, right in front of where his screen was. Do you think that was because he though Mr. Wilson deserves the bed so he would go and sleep on the couch?  I submit to you the reason he was out there was because he was keeping complete surveillance on who was coming and going.

The trial judge again sustained the objection.  After that, defense counsel argued:

Why do you think that surveillance system was there?  Was it because they were going to watch for the police to come?  Perhaps.  But you heard evidence that Mr. Caldera—one of the things he did was he went and ripped off other drug dealers.
Do you think it's reasonable that perhaps he was fearful of others coming after him?  You heard Mr. Wilson talk about being with him when he shot a couple other people.

Defense counsel stressed to the jury that it was not felony murder if Wilson and Camper

killed the victims out of fear and then stole their money afterwards.

Defense counsel further argued that Wilson made the incriminating statements to the

police in an attempt to tell them what they wanted to hear and avoid a 25 to life sentence:

[DEFENSE COUNSEL]: Don't you think that after·hearing all of that from the officers, Mr. Wilson got to thinking, maybe my best way to get out of 25 to life is tell them that story that they just repeated to me over and over again?

[THE PROSECUTOR]: Your Honor, I'm going to object.  It's improper argument. There's no evidence—

9

[THE COURT]: Sustained.

[THE PROSECUTOR]: Move to strike.

[THE COURT]: It's stricken.

[DEFENSE COUNSEL]: The ironic thing about the District Attorney's argument is that she's telling you, on one hand, that Mr. Wilson finally came out and told you the truth; I think that's very suspect, especially when, on the other hand, she's telling you but he was lying, too, because he's the one who fired the gun.  You can't have your cake and eat it, too.  I mean, is that a possibility?  Perhaps.  But to say that you should believe beyond a reasonable doubt that what he told you on these occasions is true, and then on these occasions is false, especially when the part that was allegedly true was the seed that was planted by the officers, I think that's asking a lot.  I don't think you can have an abiding conviction that that is the truth.

After the close of arguments, the jury begin deliberations.  The jury then returned verdicts finding Wilson guilty of first-degree murder as to counts 1 and 2 and finding true the special circumstance allegations that each murder was committed during a robbery and that there was more than one murder.  The jury found not true the allegation that Wilson personally used a firearm to murder Caldera and made no finding as to the allegation that Wilson personally used a firearm to murder Werder.  The trial court subsequently sentenced Wilson to state prison for consecutive terms of life without parole.

Through counsel, Wilson appealed his conviction, arguing that: 1) the trial court abused its discretion and violated Wilson's due process rights by refusing to require Brown to turn over the notes from Wilson's interview; 2) the trial court violated California's reporter shield law and Wilson's rights to counsel and due process by excluding defense counsel from the in camera hearing regarding Brown's notes; 3) the trial court violated Wilson's confrontation rights when it denied his request to strike Brown's direct examination testimony; 4) the trial court violated Wilson's rights to counsel and to present a defense by restricting defense counsel's closing

argument; and 5) the trial court erred in the aiding and abetting instruction it charged to the jury.

On January 22, 2013, the California Court of Appeal unanimously affirmed Wilson's conviction

in a reasoned, unpublished opinion. *Wilson*, 2013 WL 222321, at *12. Appellate counsel then

petitioned the California Supreme Court for review, which was summarily denied on May 1,

2013. Appellate counsel also filed in the United States Supreme Court a petition for a writ of

certiorari, which was denied without comment on October 7, 2013.

Wilson timely filed the instant Petition for a Writ of Habeas Corpus to this Court on July

30, 2014.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Wilson raises two grounds for relief. First, he

argues that the trial court violated his right to confrontation when it denied his request to strike

Brown's direct examination testimony. Wilson additionally contends that the trial court violated

his rights to due process and to present a defense by limiting defense counsel's closing argument,

which he claims precluded Wilson from arguing that the prosecution failed to prove a necessary

element of the felony murder charge.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

12

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

Wilson has not replied to Respondent's answer.  The relevant statute provides that "[t]he

allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v.*

*Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

A.      *Denial of Request to Strike the Reporter's Direct Examination Testimony* (Ground 1)

Wilson first argues that his right to confrontation was violated by the trial court's order

denying Wilson's request to strike the reporter's direct examination testimony.  The importance

of Brown's testimony in this case cannot be understated.  Without that testimony, the main

evidence against him was his inculpatory statement to police officers that he intended only to rob

the victims but that Camper went against his wishes and killed them, a statement that he could

potentially challenge as coerced.  Brown's testimony, however, corroborated Wilson's statement

to the police that the killings were committed in the course of a planned robbery.  It therefore

effectively precluded any argument that the killings were committed to avoid being killed by

Caldera and Werder or that Wilson's statement to the police was falsely induced to tell the

officers what they wanted to hear.  The trial court nonetheless denied Brown's motion to strike after ruling that Brown's testimony was admissible as past recollection recorded.

The Court of Appeal denied Wilson's claim that the trial court's order violated his confrontation rights, reasoning that "[b]ecause, under the shield law, the reporter's notes were not available to Wilson during his cross-examination of Brown, the court's ruling did not violate his right to confrontation" and "any error by the court would have been harmless beyond a reasonable doubt because . . . Brown's notes did not contain any information material to Wilson's defense."  *Wilson*, 2013 WL 222321, at *11.  Wilson argues that the Court of Appeal "mischaracterized the claim as one based on refusal to allow cross-examination using the notes." He instead argues that the testimony should have been stricken in its entirety because Brown did not submit to full cross-examination.

In his Petition, Wilson acknowledges that Brown answered questions on a number of topics during cross-examination.  He contends that he was nonetheless denied the right to confront Brown by Brown's refusal to answer questions regarding the following areas of cross-examination:

1. The manner in which the reporter was asking petitioner questions during the interview;

2. The order of interview questions;

3. Whether petitioner described the robbery plan in more detail than was stated in the article;

4. Petitioner's demeanor;

5. Whether a particular line in the article was attributable to petitioner's interview statement or some other source;

6. Questions seeking content of the reporter's notes.

14

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. CONST. amend. VI.  The right to cross-examine a witness includes the opportunity to show not only that a witness is biased, but also that the testimony is exaggerated or otherwise unbelievable.  *Fowler v. Sacramento County Sheriff's Dept.*, 421 F.3d 1027, 1035 (9th Cir. 2005) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52 (1987) (plurality opinion)).  In *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992), the Ninth Circuit laid out a two-part inquiry to determine whether a petitioner's Sixth Amendment rights are violated by restricted cross-examination.  The first inquiry is whether the evidence is relevant.  *See id*. at 1550.  If the evidence is relevant, the next inquiry is whether other legitimate interests outweigh the defendant's interest in presenting the evidence.  *See id*.  Hence, to show a restriction on cross-examination violates the Confrontation Clause, a defendant must demonstrate "'[a] reasonable jury might have received a significantly different impression of a [witness's] credibility had counsel been permitted to pursue his proposed line of cross-examination.'"  *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1974)).  A limitation on cross-examination "does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant."  *United States v. Bensimon*, 172 F.3d 1121, 1128 (9th Cir. 1999) (internal citation and quotation marks omitted).

Under these guidelines, this Court cannot find that the restricted cross-examination was either unreasonable or contrary to federal law because he fails to show that the cross-examination questions Brown refused to answer would have led to relevant evidence.  *See Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983) ("Evidence of little importance, whether merely

15

cumulative or of little probative value, will almost never outweigh the state interest in efficient

judicial process."). As an initial matter, Wilson appears to concede that Brown's testimony

about the foundational aspects of the article was sufficient to qualify the testimony as past

recorded recollection. Thus, Brown's assertion of the journalist privilege had no material impact

on the admissibility of the testimony as a recorded recollection. As the Ninth Circuit and other

courts have so held, introduction of past recollections recorded does not run afoul of the Sixth

Amendment. *See United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976); *accord United

States v. Picciandra*, 788 F.2d 39, 42-43 (1st Cir. 1986); *United States v. Smalls*, 438 F.2d 711,

714 (2d Cir. 1971).[3]

Moreover, as the Court of Appeal noted in disposing of a different claim on direct appeal,

"to the extent the defense sought to cross-examine Brown on matters outside the notes

themselves in an effort to cast doubt on the accuracy of his article, arguably implicating a right to

cross-examination that overcome the shield law's protection, such examination could not have

---

[3]     The Court acknowledges that these cases, as well as *United States v. Owens*, cited
*infra*, were decided before the Supreme Court's landmark decision in *Crawford v. Washington*,
541 U.S. 36, 68 (2004). It nonetheless appears that these cases survive *Crawford. See, e.g.*,
*Yanez v. Minnesota*, 562 F.3d 958, 964-965 (8th Cir. 2009) (holding that admission in state
criminal trial of out-of-court statements where witness was unable to recall the details of her
prior statements did not violate defendant's right to cross-examination under *Owens* and
*Crawford*); *see also Vasquez v. Kirkland*, 572 F.3d 1029, 1038 (9th Cir. 2009) (in a case
involving a deaf witness whom it was difficult to cross-examine, the Ninth Circuit observed that
the fact situation was closest to *Owens* but held that there was no factually analogous Supreme
Court decision finding a Confrontation Clause violation based on a witness's own physical
impairments). Likewise, after *Crawford* was decided, the Ninth Circuit relied on *Owens* for the
proposition that "*feigned* memory loss" by a witness at trial does not preclude the admission of
the witnesses's earlier statements to police. *See Felix v. Mayle*, 379 F.3d 612, 617-18 (9th Cir.
2004), *reversed in part on other grounds*, 545 U.S. 644 (2005).

been availing in light of Brown's lack of recollection of the details of the interview."[4]  *Wilson*, 2013 WL 222321, at *11 (citation omitted).  This conclusion is consistent with the record, which indicates that, at both the preliminary hearing and at trial, Brown testified that he could not specifically recall the details of the interview and testified only to his general practices and procedures.  To the extent that Wilson argues that Brown's inability to recall the specific details of the interview itself violates Wilson's confrontation rights, the Supreme Court has rejected such claim.  The "opportunity [for effective cross-examination guaranteed by the Confrontation Clause] is not denied when a witness testifies as to his current belief but it unable to recollect the reason for that belief.  It is sufficient that the defendant has the opportunity to bring out such matters as . . . the very fact that he has a bad memory."  *United States v. Owens*, 484 U.S. 554, 559-60 (1980) (internal quotation marks and citations omitted).

It is also important to note that there is nothing in the trial court's rulings that prohibited Wilson from cross-examining Brown as to any alleged bias.  *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.").  Wilson does not allege in his Petition that Brown was biased, and in fact, Brown's involvement as an independent third party is what makes his testimony so devastating to Wilson's case.  Rather, as Wilson acknowledges, Brown's refusal to submit to full cross-examination on the identified areas only affected Wilson's ability to show that Brown's testimony was unreliable.  But because Brown did not recall the specifics of the interview, it is not likely that his testimony would have been

---

[4]      Wilson does not appear to challenge here the Court of Appeal's ruling that he was not entitled to Brown's notes or to cross-examine Brown about the substance of the notes.

viewed as unreliable had he answered the identified questions.  Indeed, as the Supreme Court has acknowledged, reliability is not the touchstone of admissibility.  *Crawford*, 541 U.S. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'").  Here, it was the province of the jury to assess Brown's credibility and the reliability of his testimony in light of all the evidence.  The jury was free to conclude that Brown's testimony was not reliable because he did not recall the specific details surrounding the interview.

For the same reasons, Wilson cannot show that any alleged confrontation violation was anything more than harmless error.  *See Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to harmless-error analysis . . . because its effect can be quantitatively assessed in the context of other evidence presented to the jury." (citations and internal quotation marks omitted)).  A petitioner is not entitled to relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Because Brown did not recall the details of the interview, Wilson cannot show that his testimony on the identified areas of questioning would have in any way swayed the jury.  Wilson is therefore not entitled to relief on this ground.

B.      *Erroneous Limitations in Closing Argument* (Ground 2)

Wilson additionally argues that the trial court violated his right to counsel and to present a defense by precluding defense counsel from arguing that the prosecution failed to prove one of the elements of the felony murder charge.

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  While the denial of an opportunity to make a closing argument violates a criminal defendant's constitutional rights, *see Herring v. New York*, 422 U.S. 853, 862 (1975) (finding that state statute authorizing trial judge in non-jury criminal case to refuse to hear defense closing argument in its entirety violated the Sixth Amendment), a trial court retains broad discretion to limit closing arguments.  As the *Herring* Court explained:

> This is not to say that closing arguments in a criminal case must be uncontrolled or even unconstrained.  The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations.  He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant.  He may ensure that arguments do not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.  In all these respects he must have broad discretion.

*Id.* at 862 (citations omitted); *see also United States v. Scheffer*, 523 U.S. 303, 308 (1998) (a defendant's interest in presenting evidence may "bow to accommodate other legitimate interests in the criminal trial process") (citations and quotations omitted).

In this case, Wilson cannot show that the limitations the trial court placed on counsel's oral argument prevented him from presenting his defense.  As the Court of Appeal concluded in rejecting this claim:

> Wilson argues that the trial court erred when it sustained prosecution objections to statements made in his closing argument that related to his theory that Camper killed Caldera and Werder not in the commission of the robbery, but because he was fearful of the two men.  He argues that these rulings violated his rights to effective assistance of counsel and to present a defense.  We disagree.
> Although Wilson has a federal constitutional right to have his counsel present at closing argument, the trial court has "broad discretion" to limit counsel's closing arguments in scope and duration.  (*People v. Rodrigues* (1994) 8 Cal. 4th 1060,

1184–1185.)  The court's first and third rulings sustaining objections to defense counsel's argument regarding Camper and Wilson's fear of Caldera did not prevent him from arguing this theory.  As defense counsel told the jury, "the reason this happened was because they had been threatened to be killed, they were fearful, so Mr. Camper shot them, and then they took the money and ran."  On the second occasion the trial court sustained the People's objection to defense counsel's argument, defense counsel nevertheless informed the jury that there was a possibility that Caldera was a man who was himself violent and made Wilson fearful.[12]

> FN12.  Defense counsel told the jury "Why do you think that surveillance system was there?  Was it because they were going to watch for the police to come?  Perhaps.  But you heard evidence that Mr. Caldera—one of the things he did was he went and ripped off other drug dealers.  [¶]  Do you think it's reasonable that perhaps he was fearful of others coming after him?  You heard Mr. Wilson talk about being with him when he shot a couple other people."

The third objection during argument was to defense counsel's argument that Wilson was lying to the police during his interview.  However, as with the other two objections, counsel nevertheless made his point.  Thus, he told the jury that "he [Wilson] wanted to avoid 25 to life.  What can he say that will stop him from getting 25 to life.  Is he lying?  Of course he's lying.  He's trying to say whatever he can to get out of 25 to life."  The statement to which the court sustained an objection on the ground that it was not supported by the evidence was very similar to the one the jury heard.[13]

> FN13.  The People's motion to strike was directed to this defense argument: "Don't you think that after hearing all of that from the officers, Mr. Wilson got to thinking, maybe my best way to get out of 25 to life is to tell them that story that they just repeated to me over and over again."

The trial court's rulings were well within its power to control the proceedings.  Although the court struck certain statements by defense counsel, it did not prevent him from presenting a defense to the jury.  We find no error.

*Wilson*, 2013 WL 222321, at *12.

The Court of Appeal's conclusions are both reasonable and fully supported by the record.

Because defense counsel was nonetheless able to make his arguments, Wilson cannot show that

the court's restrictions prevented him from presenting a complete defense.  And for the same

reasons, even assuming *arguendo* that the trial court erred, Wilson cannot show that such error

had a "substantial and injurious effect."[5]  *See Brecht*, 507 U.S. at 638.  Because the jury was able

to hear counsel's argument, Wilson cannot show that the trial court's imposed limitations had

any impact upon the jury's verdict.  Wilson therefore cannot prevail on this claim either.

V. CONCLUSION AND ORDER

Wilson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 17, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

---

[5]      Wilson argues that any error in the restriction of closing argument is structural,
apparently relying on the Ninth Circuit's decision in *Frost v. Van Boening*, 757 F.3d 910 (9th
Cir. 2014) (en banc).  But the U.S. Supreme Court recently reversed *Frost* and made clear that
there is no clearly established Supreme Court decision that stands for the proposition that a
restriction on closing argument is structural error that requires automatic reversal.  *Glebe v.
Frost*, 135 S. Ct. 429, 430-31 (2014).